IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 14, 2014 Session

**IN RE: TYLER P., ET AL.**

**Direct Appeal from the Juvenile Court for Shelby County**
**No. S2952      Curtis S. Person, Jr., Judge**

**No. W2014-00542-COA-R3-JV - Filed January 27, 2015**

This appeal arises from a petition in juvenile court to modify custody. In December 2006, the juvenile court issued an order granting Mother primary residential custody of the parties' two children and granting Father visitation. In May 2013, Father petitioned the court for custody of the children. A hearing was conducted in October 2013. The court found that Father met his burden of showing a material change of circumstances but determined that the children's best interests would not be served by granting Father custody. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

Brandon O. Gibson, J., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Mitchell David Moskovitz, Adam Noah Cohen, Hillary Gail Hill and Laura Kirkland Bible, Memphis, Tennessee, for the appellant.

Sheree L. Hoffman and Russell A. Hayes, Germantown, Tennessee, for the appellee.

**OPINION**

### I. BACKGROUND AND PROCEDURAL HISTORY

Appellant Brandon P.[1] ("Father") and Appellee Krysten S. ("Mother") began dating in 2001. Though they were engaged for a period, they never married. Over the course of their

---

[1]We have used initials rather than last names in this opinion in order to protect the identity of the children.

relationship, they had two children together–a son, Tyler P., born in April 2003 and a daughter, Kayleigh P., born in July 2004. Though the children were born in New Jersey, Mother, Father, and the children moved to Mississippi in August 2004 to be closer to Mother's family. The relationship between Mother and Father quickly deteriorated after they moved to Mississippi. In November 2004, Mother and Father separated. Father returned to New Jersey, while Mother and the children remained in Mississippi with Mother's family. In March 2005, a Mississippi Chancery Court entered an agreed order naming Mother the children's primary residential parent and providing a parenting schedule for Father's visitation.

Sometime prior to December 2006, Mother moved to Tennessee with the children. In December 2006, the Juvenile Court of Memphis and Shelby County, Tennessee entered a consent order to assume jurisdiction over the matter and to modify the parenting schedule. The order provided that the parties would continue to share joint custody of the children, with Mother serving as the primary residential parent. It also set out a new parenting schedule that designated certain visitation periods for Father during the children's breaks from school. In the present litigation, both Mother and Father sought to modify the December 2006 order.

Following their breakup and the entry of the December 2006 order, both Mother and Father moved on with their lives. Mother continued to reside in and around Shelby County with the children. Mother has been married three times and divorced three times since 2006. Due in part to her marriages, Mother and the children have moved frequently in and around Shelby County. In December 2006, Mother and the children lived in Shelby County with her first husband and his daughter, who Mother testified was about eight or nine years old at the time. That marriage ended in September 2007, when Mother's husband moved to New Orleans for a job, and she was not able to go with him. Shortly thereafter, Mother and the children moved back to Mississippi, and Mother started a relationship with a man who would later be her second husband. Mother had a child with this man in July 2008. Later in 2008, Mother and the children moved in with him in an apartment in Cordova, Tennessee. Mother married him in February 2009–her second marriage. This marriage also did not last long. According to her testimony at trial, Mother and the children moved out in April 2009, after she discovered that the man was having an extramarital affair. She and the children moved into a house in Cordova, and Mother enrolled the children in Dexter Elementary for the 2009-2010 school year. After that school year, the school district's lines were redrawn, and in May 2010, Mother moved the children to another home nearby so they could continue to attend the school. Mother and the children only stayed in that home for a few months, however, because according to Mother, they were forced to move out in October 2010 when the landlord failed to address serious repair issues. From there, Mother and the children moved in with Mother's then-boyfriend, who would later become her third husband. In November 2010, Mother's second divorce became final. In May 2011, she remarried for a third time. Mother enrolled

Tyler P. and Kayleigh P. in private school for the 2011-2012 school year. Mother and the children continued to live with her third husband and his eight year old daughter for about a year before they separated.[2] In October 2012, Mother and the children moved into a three-bedroom house in Lakeland, Tennessee, where they remained at the time of the hearing in this case. Mother took the children out of private school and enrolled them at Lakeland Elementary. She stated at the hearing that she had no plans to move again. Mother testified that she earns approximately $40,000 per year.

Following his 2004 split with Mother, Father returned to New Jersey and moved in with his parents. Father continued living with his parents until moving into an apartment in 2010. He married in July 2011. Around the same time, a contract to purchase a house fell through, and Father and his wife moved in with her parents for a short period. In January 2012, Father and wife moved into a three-bedroom house in Old Bridge, New Jersey, where they were still living at the time of the hearing. After their marriage, Father adopted his wife's seven year old son from a previous relationship. Father also had another son with her in 2012. In 2012, Father earned approximately $150,000 working as a senior network engineer for a company in New York City.[3]

For a period of time following the December 2006 order, the parties were able to maintain a somewhat cordial relationship and allowed each other some degree of flexibility regarding their parenting schedule. Father testified that "[i]n the past, [Mother] and I have always come to an agreement on something that accommodated both of us . . . ." However, the parties' relationship soured in 2008 after they entered a private agreement purporting to temporarily set out a parenting schedule different from the one provided for in the court's order. In late 2007, Mother wanted to return to school to finish her degree, and Father agreed to keep the children for a year so that she would be able to do so. As evidence of their agreement, Mother and Father both signed a document stating that, beginning on November 1, 2007, the children would primarily reside in New Jersey with Father for a period of time, at least until January 1, 2009. Though the parties' agreement purported to alter the parenting schedule set forth in the December 2006 order, it was not entered with the court. As it turned out, Mother was unable to re-enroll in school. She asked Father to disregard the private agreement and return the children pursuant to the December 2006 order. Father apparently resisted, and Mother drove to New Jersey and retrieved the children in March 2008. Upset that Mother took the children back to Tennessee in contravention of their agreement, Father

---

[2]Mother's third divorce became final in June 2013.

[3]In her appellate brief, Mother asserted that Father lost this job following the entry of the trial court's judgment. Though Father acknowledged that statement to be true in his reply brief, because Mother did not submit a motion to consider this post-judgment fact, we decline to do so.

filed a petition seeking primary custody of the children in September 2008. After several delays, the case was heard by a Juvenile Magistrate on August 2009. Father failed to appear at the hearing, and his motion was dismissed. Shortly thereafter, Father filed a request for a rehearing but failed to follow up on it.

The matter laid dormant in the trial court for nearly four years until May 2013, when Father filed an amended petition requesting primary custody of the children and a motion to appoint a guardian ad litem. In his amended petition, Father made numerous allegations regarding the effect that Mother's instability and personal relationships had on her fitness to care for the children. Father alleged that the children's performance in school was suffering as a result of the constant change and further alleged that they did not exhibit a strong work ethic. Father also alleged that the change caused Kayleigh P. to suffer from social problems. Father also made additional allegations regarding Mother's fitness as a parent. Finally, Father alleged that the children had both expressed a strong desire to live with him in New Jersey and that it would be in their best interests to do so.

Mother filed an answer to Father's amended petition and also filed a counter-petition seeking to hold Father in civil and criminal contempt, for attorney's fees, and to modify the December 2006 order. Mother stated that the children made satisfactory grades, despite struggling with a transition between schools necessitated in part by Father's refusal to continue paying for private school. Mother alleged that Father inappropriately discussed the litigation with the children and that after returning from his care, the children knew of the court proceedings and court date before she did. In her counter-petition, Mother alleged that Father disregarded the terms of the December 2006 order on multiple occasions by keeping the children for longer than the parenting plan provided. She stated that although the plan provided for the parties to drive and exchange the children in Atkins, Virginia, the parents agreed that flying the children was better. Mother alleged that she wanted the children to continue flying to New Jersey for visitation with Father, but she was not able to continue paying for half of their airfare. She requested that the court modify its order to provide that the children fly to and from New Jersey for visitation with Father and require Father to be responsible for the expense of the children's round trip airfare. Additionally, Mother stated that it was not in the children's best interests to live with Father because he had shown great animosity toward her and would not promote a good relationship between her and the children. Mother stated that Father's disdain for her was clear in negative Facebook posts he wrote about her. She alleged that Father had refused to give Kayleigh P. her prescribed medication. Mother requested that the court grant her attorney's fees, and also requested a hearing to determine whether Father should be held in contempt for violating the December 2006 agreement.

On July 30, 2013, the trial court entered an agreed order appointing Laurie W. Hall as

guardian ad litem to represent the best interests of the children. The matter was heard in the juvenile court on October 14 and 15, 2013. The court heard an opening statement from Ms. Hall, as well as testimony from the parties and their witnesses. Ms. Hall stated initially that both parents loved and cared for the children. She stated that while Mother's stability was an issue, she had serious concerns about the amount of information Father provided the children about the litigation. She testified that Mother always made an effort to act in the best interests of the children despite her instability. She further stated her belief that Mother's actions had not significantly impacted the children in any detrimental way. Rather, she submitted that the only real change she saw in the children was the amount of anxiety Tyler P. displayed, which she believed was a direct result of the amount of information Father shared with him about the litigation. Finally, Ms. Hall expressed a concern with Father's willingness to facilitate a loving relationship between the children and Mother, should he be awarded custody. Following Ms. Hall's statement, the court heard testimony from Mother, Father, and several other witnesses. The court declined to hear testimony from the children. Father failed to present evidence to support many of the allegations he made in his amended petition to modify custody. The trial court issued a detailed final order on January 31, 2014. The court concluded that although each party showed a material change of circumstance since the December 2006 order, it was not in the children's best interests to modify the underlying order to grant Father primary custody of the children.

The court weighed the relevant statutory factors provided by Tennessee Code Annotated section 36-1-106(a) to determine the best interests of the children and set forth detailed findings of fact in its order, reflecting a careful review of the testimony and evidence. As is often the case, the court found that many of the factors were either not relevant or weighed equally in favor of each parent. The court found that the mental and physical health of the parents was not at issue, nor was the character and behavior of other persons in the home of either parent. The court also found that both parents could provide good homes for the children and that the children's school records were good, given their circumstances. The court found that the children received adequate food and clothing in Mother's care and that she had shown concern for the children's education and medical care. The court credited both parents for creating a sense of normalcy in the children, despite the lack thereof. In order to make its decision, the court ultimately weighed the instability in Mother's life against Father's character and his negative attitudes towards Mother. Though the court found that both parents loved the children and had close bonds with them, it expressed concern regarding Mother's inability to maintain stable romantic relationships and Father's manipulation of the children regarding his decision to seek custody. The trial court was troubled by the frequency with which Mother had introduced the children into new step-families and observed that Father has only been married once and had adopted his wife's son. Despite those concerns, the court

found that Mother's instability was outweighed by Father's personal animosity toward Mother and his attempts to influence the children's preferences. The court found that Father attempted to manipulate the children by discussing the litigation with them and by encouraging Tyler P. to call Mother to ask her if he could live in New Jersey. The court found Father's actions "inexcusable." Regarding Father's animosity toward Mother, the court was particularly concerned with a Facebook post Father wrote in 2009 or 2010 that stated:

> I HATE [MOTHER]!!! What a pathetic waste of life. I can't believe God created such a thing that is as poisonous to people's lives as she is! God . . . please correct this mistake you've made.
>
> . . . .
>
> Let's be realistic here . . . IF she pays at all, it'll be after she has screwed up the kids beyond repair. God created her, and she is evil, so God creates evil as well. I want God to fix the mistake he made in giving her life, so that I can give the kids a GOOD life and not make them wish they didn't have a mother everyday.

The court concluded that Father's hostility toward Mother outweighed the instability in her life and further concluded that he would not promote and encourage a close relationship between Mother and the children if awarded custody. The court stated:

> This Court finds that primary custody with the father would be detrimental to these children given his proclivity to manipulate their love and affection for their Mother that is evidentially based in his unbridled dislike for her as a person. The proof of her volatile love life pales in the face of his recent and past actions.

Notably, the court also found that Father was not a credible witness. The court stated that, "[i]t is clear to this Court that the father has a serious problem with telling the truth. Considering his demeanor and affect at trial this Court finds him to be incredible [sic]."

In light of its findings, the trial court denied Father's request to be awarded custody of the children. It also ordered that Mother seek counseling to address her personal decision making and parenting skills and that Father and his wife complete an extended parenting training course. The court granted Mother's request to modify the parenting plan to require that the children fly to and from New Jersey for visitation with Father at Father's expense.

The remainder of Mother's petition was denied. Finally, the court ordered Father to pay the guardian ad litem's fees as well as Mother's attorney's fees. Father timely filed a notice of appeal.

## II. ISSUES

Father raises the following issues for review on appeal, as we have restated them:

1.     Whether the juvenile court erred in dismissing Father's petition to modify the parenting plan.

2.     Whether the juvenile court erred in granting Mother's petition in part.

3.     Whether the juvenile court erred by requiring Father to pay Mother's attorney's fees and the Guardian Ad Litem's fees.

## III. STANDARD OF REVIEW

The trial court's factual findings are accorded a presumption of correctness on appeal, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014). For evidence to preponderate against a trial court's finding of fact, it must support another finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). In weighing the preponderance of the evidence, the court's findings of fact that are based on witness credibility are entitled to great weight on appeal and will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). We review the trial court's resolution of questions of law under a pure *de novo* standard with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

## IV. DISCUSSION

### A. Best Interests of the Children

The decision to modify an existing parenting arrangement requires a two-step analysis. The party petitioning the court to change an existing custody order must establish (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick v. Shoemake*, 90 S.W.3d 566, 575 (Tenn.

2002). The trial court found that Father met his burden of establishing a material change of circumstances. Because neither party challenges that finding, we move past that issue and address whether the trial court erred in determining the best interests of Tyler P. and Kayleigh P.

In all custody cases, the welfare and best interests of the children are of paramount concern. *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). However, there are no hard and fast rules for determining which custody and visitation arrangement will best serve a child's needs. *Gaskill v. Gaskill*, 936 S.W.3d 626, 630 (Tenn. Ct. App. 1996). It is a factually driven inquiry that requires the court to carefully weigh numerous considerations. *Id.* Because such determinations often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings, trial courts are vested with broad discretion to fashion "arrangements that best suit the unique circumstances of each case." *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). As a result, appellate courts are reluctant to second-guess a trial court's determination on custody and visitation matters. *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012).

In a custody dispute between natural parents, courts apply the doctrine of comparative fitness to determine what custody arrangement is in the children's best interests. *Koch*, 874 S.W.2d at 575 (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983) ("We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of 'comparative fitness.'")). Though trial courts have broad discretion in making custody determinations, their discretion is not absolute. Instead, it is constrained by Tennessee Code Annotated Section 36-6-106, which states that custody decisions must be made based on the best interests of the child and directs the court to consider all relevant factors, including, where applicable, the following:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7) The reasonable preference of the child if twelve (12) years of age or

older. . . . ;

> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;
>
> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
>
> (10) Each parent's or caregivers past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106 (2010).[4]

In making its custody determination in this case, the trial court explicitly relied on the factors set forth in Section 36-6-106 and addressed the relevance of each. The court found eight of the ten factors to be relevant. After weighing the relevant factors, the court concluded that the children's interests would be best served by remaining in Mother's primary custody. Father argues that the evidence presented during the hearing preponderates against a number of the trial court's findings and that a proper balancing of the statutory factors reveals that the children's best interests would be served by residing primarily with him. We address Father's arguments in the order in which he presents them in his brief.

### 1. Father's Influence Over Children's Preference

The trial court found that, while both parents love the children and have strong emotional ties with them, each has made poor decisions in their personal lives that have affected the children emotionally. Specifically, the court expressed concern over Father's manipulation of the children as it relates to his decision to seek custody. The court also expressed concern over the emotional impact Mother's inability to maintain long-term, stable relationships could have on the children. Though the court stated that both parents were at fault, it found that Father's actions were "inexcusable" and "far outweigh[ed]" Mother's.

---

[4]The General Assembly amended Section 36-6-106 in 2014 to set out fifteen factors for courts to consider in making a best interests custody determination. *See* 2014 Tenn. Pub. Acts Ch. 617 (S.B. 1488). The current version of the statute is codified at Tenn. Code Ann. § 36-6-106 (2014). Because the statutory revisions did not take effect until July 1, 2014, we apply the statute in effect when the trial court's order was entered in January 2014.

Father argues that the evidence in the record does not support the court's conclusion. Primarily, Father contends that the court erred in finding that he manipulated the children by discussing the litigation with them and actively encouraging Tyler P. to call his Mother and ask to live in New Jersey. Father admits that he and his wife discussed the litigation with the children but contends that he only allowed Tyler P. to call Mother to ask about moving to New Jersey and did not encourage him to do so. We note, however, that the testimony of Father's wife appears to contradict Father's testimony:

Q. And were you aware that [Father] on occasion would have [Tyler P.] call [Mother] to ask her if he could live with him?

A. Yes.

Q. And were you present when that occurred?

A. I believe only one time I was present.

. . . .

Q. So it didn't concern you at all that you – or that [Father] would have the minor child call his mother to ask her that?

A. That was what [Tyler P.] wanted. He's been wanting that for years, so it didn't really concern me, no.

On appeal, Father relies on little more than his own testimony as evidence that the preponderance of the evidence weighs against the trial court's finding. In light of our directive to give great weight to the court's determinations of witness credibility, these arguments are significantly weakened by the trial court's specific finding that "the father has a serious problem with telling the truth." Indeed, the court's finding with regard to Father's veracity in and of itself weighs against Father's suitability to be the children's custodian. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 634 (Tenn. Ct. App. 1996) ("A parent's honesty reflects on his or her fitness to be a good custodian of the child."). In light of the record before us, we cannot say that the evidence presented preponderates against the trial court's finding.

Moreover, we do not find that the court erred in characterizing Father's activity as manipulative and emotionally damaging to the children. In his brief, Father quotes the concurrence of a 2013 Tennessee Court of Appeals case that, "[t]o say that Father should not

have discussed the parties' divorce with the children is simplistic and not grounded in reality." *Porter v. Porter*, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at *14 (Tenn. Ct. App. Jan. 25, 2013) (Kirby, J., concurring). In reliance on that statement, Father argues that because some discussion of litigation with the children is unavoidable, the trial court erred in characterizing his actions as "inexcusable." We disagree. The facts of that case are vastly different from those in the case at bar. *Porter v. Porter* was a divorce case in which the father requested a paternity test from the mother to determine whether he was the biological father of the parties' son. *Id.* at 8. The mother in *Porter* told the parties' son about the paternity test in a manner calculated to lead the son to wonder if his father wanted him. *Id.* After being told about the paternity test, the son called his father crying. *Id.* at 9. When the children later visited their father, they asked him about the litigation, and he sat down with them to discuss it. *Id.* By contrast, it is clear in this case that Father discussed the litigation with the children on his own accord and not in response to any questions they had about statements by Mother. In fact, Mother testified that the children knew about the litigation before she did. Father admitted to telling Tyler P. that he hired a lawyer to get custody of him and told him about an upcoming court date. Father admittedly told Tyler P. that "if Mommy would let you live here, I will gladly let you live here." Assuming that the children wish to live with Father, we see no reason for Father to make such a statement other than to vilify Mother as the "bad guy." Accordingly, we find no error in the trial court's finding that Father's behavior was calculated to manipulate the children's love and affection for Mother.

## 2. Educational and Medical Needs

Father argues that the trial court failed to appropriately consider deficiencies in the children's educational and medical records in Mother's care. With regard to the children's education, the trial court found that "[t]heir school records are actually good given the lack of insight their parents have into their own behavior." Father contends that the evidence presented does not support the court's statement. Father argues that the evidence shows that the children's education is not important to Mother. First, Father points out that the children have changed schools frequently in Mother's care. While that is true, Mother's unrefuted testimony was that she actually moved into a new house at one point in order to allow the children to continue attending Dexter Elementary after the school district boundaries were changed. Mother also sent the children to private school until she could no longer afford it. It is undisputed that Father did not help pay for the children's private school tuition, though the parties dispute whether he ever agreed to do so. Multiple witnesses testified that Mother helps the children with their homework every night, and Mother testified that she attends every parent-teacher conference.

Next, Father contends that the children's poor grades are further evidence of Mother's lack of emphasis on education. The evidence does not support his contention. Though each of the children received low marks in some courses for various quarters, neither child received a final grade below a "C" in any subject during either of the two school years immediately preceding trial. The evidence presented supports the trial court's conclusion that the children's grades are actually good given their circumstances. In light of the foregoing, we find no merit in Father's contention that the trial court erred by failing to consider the children's education as a factor weighing against Mother.

Father next challenges the trial court's finding that Mother has shown clear concern for the children's medical care. First, Father points to the children's poor dental records, particularly those of Tyler P., who at the time of trial had undergone three root canals, had a tooth extracted, and had "significant" cavities. He also points out that notes in Kayleigh P.'s dental records describe her oral hygiene as "poor." Mother expressed concern regarding the children's dental issues but testified that bad teeth runs in her family. She testified that she takes the children to the dentist for checkups every six months, makes them brush twice a day, and flosses their teeth for them. She further stated that she limits their consumption of candy, sugar, and sodas. Father did not offer any evidence to suggest that either of the children's dental problems was caused by Mother's neglect.

Father also challenges the court's finding that Mother has demonstrated greater diligence than Father in addressing Kayleigh P.'s other medical issues. In 2011, Kayleigh P. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), for which she was prescribed medication. The trial court stated in its order that it believed Father would not continue Kayleigh P.'s prescribed medication if awarded custody. Father contends that the court's finding has no basis in the record. We disagree. Though the parties dispute the reason why, it is clear that prior to the hearing, Kayleigh P. had not been taking her medication when she visited Father. According to Mother, she initially sent Kayleigh P.'s medication with her to New Jersey when it was prescribed, but she stopped because Father told her he would not give it to the child. Father, on the other hand, testified that Mother never sent medication with Kayleigh P. to New Jersey. In fact, Father initially testified in his deposition that Mother never even told him about Kayleigh P.'s ADHD diagnosis. At trial, however, Father acknowledged receiving emails from Mother in 2011 referencing the diagnosis and listing contact information for her doctors. Father stated that he did not recall whether he ever contacted Kayleigh P.'s doctors to ask about the diagnosis. Notably, Father testified that he believed Kayleigh P. would be fine without taking her medication and stated that he had Kayleigh P. evaluated by a social worker in New Jersey who concluded that she was fine. Though Father testified that after seeing Kayleigh P.'s medical records and doing some

research, he "absolutely would continue to give [Kayleigh P.] her medication," the court stated in its order Father "had to be prodded during direct [examination]" to do so. The court also stated that it was "struck by his demeanor and affect during this part of his testimony." The court found that Father's testimony on the issue was not credible. In light of the broad discretion of the trial court to make findings based on witnesses' demeanor and credibility, we find that Father's argument that the court made improper findings with regard to, or improperly weighed, the children's medical care is without merit.

### 3. Stability

Father contends that the trial court failed to give appropriate weight to the stability he would bring to the children's lives if awarded custody. The trial court actually found that this factor weighed in Father's favor, but stated that it did so "just barely." Father argues that this factor should have weighed more heavily in his favor.

In its order, the court expressed its concern with the number of times Mother and the children have changed residences and, to a greater extent, with Mother's questionable partner choices. The frequency with which Mother moved the children and introduced them to new stepfamilies, which is outlined above, cannot be overlooked. The trial court found, however, that Father's life has not always been a model of consistency either. Admittedly, Father lived in four different residences in New Jersey between 2010 and 2013. Though Father testified that at least one of the moves was not precipitated by factors within his control, the same argument can be made for several of Mother's moves. In any event, it is clear in the court's order that Father's ability to provide stability in the children's lives was the factor weighing most heavily in his favor. Even Mother concedes that Father and his wife present a more stable family unit than she does. We note, however, that there was little evidence presented at trial to indicate that the children suffered as a result of Mother's moves and relationships. Witnesses described both children as normal, well-adjusted children. Though a 2013 report from her school described Kayleigh P. as a "loner "with "very few close friends," none of the witnesses that testified seemed to agree with that characterization of her. Mother testified that she was well-adjusted outside of school. Father testified that she was "very outgoing" and had many friends. Several other witnesses also rejected the characterization of Kayleigh P. as a "loner." In light of all of the circumstances, we find no evidence in the record to suggest that the trial court weighed the parents' relative stability inappropriately.

### 4. Willingness to Facilitate a Close And Continuing Parent-Child Relationship

The primary factor weighing against Father was the court's finding that he would not

be willing to facilitate and encourage a close relationship between Mother and the children. In weighing this factor, the court's main concern was the level of vitriol Father expressed towards Mother. The proof is clear that Father has, at times, had trouble controlling his anger directed at Mother. Perhaps the clearest evidence of Father's anger is the Facebook post admitted into evidence at trial, in which Father stated that he hated Mother, called her "a pathetic waste of life," and stated that "I want God to fix the mistake he made in giving her life." On another occasion, with Tyler P. present, Father punched a hole in a wall after getting off the phone with Mother. In its order, the court noted Mother's testimony that on one occasion she had to call the police to physically remove the children from Father's home at the end of a visit. Father did not deny that such an incident took place. Though Father's wife testified that he was working on controlling his anger, these outbursts, coupled with the court's finding that Father has attempted to manipulate the children's preferences, cast serious doubt as to whether Father would facilitate a loving relationship between Mother and the children if awarded custody. On the other hand, the evidence reflects that Mother has worked diligently to encourage a bond between Father and the children. Text messages introduced at trial show that when the children fly to New Jersey, it is primarily Mother who researches flights for them. Mother testified that she has driven the children to Nashville "[m]any, many times" to make flights to see Father. On one occasion, Mother actually took off work and flew to Atlanta with the children to make sure they made their flight to New Jersey before flying back to Memphis that night. Though she was making far less money than Father, the parties split the cost of the children's airline tickets. Despite Mother's efforts, on one occasion when Mother told Father in a text message that she could not afford a flight for Kayleigh P., Father responded, "If [Kayleigh P.] isn't on the 4:00 p.m. flight with [Tyler P.] I'm filing a complaint. . . . Get your s*** together and buy her ticket." In light of the record, we find that the evidence does not preponderate against the trial court's finding with regard to this factor.

### 5. Balancing the Relevant Factors

After making its findings with regard to each factor, the trial court is required to weigh the relevant factors to determine whether a modification of custody is in the best interests of the children. As we stated previously, the trial court has wide discretion when weighing statutory and other relevant factors to make a custody determination. As is often the case, the majority of the relevant factors in this case do not clearly favor one parent or the other. The record is clear that both parents love the children deeply and care for their well-being. Both parents are able to provide clothing and shelter for the children. The primary factors that supported Father's request for custody of the children relate to the lack of stability Mother provides in their lives. Mother has been married and divorced three times since 2006, while

Father has only been married once.  Additionally, Mother has lived in seven different residences with the children since that time, while Father has lived in four. While in Mother's care, Tyler P. has attended four different schools, and Kayleigh P. has attended three.  The primary factor weighing against Father relates to his willingness and ability to facilitate a close and continuing relationship between Mother and the children.  The court found that Father's attempts to manipulate the children's love and affection for Mother was based in his "unbridled dislike for her as a person." Ultimately, the court determined that its concerns with Father's conduct outweighed its concerns regarding the stability of the children's lives in Mother's care and denied Father's request to be awarded custody of the children.

 After reviewing the record, we do not find that the trial court abused its discretion in making its determination.  It is not clear from the evidence in this case that either parent is a substantially more or less fit custodian of the children than the other.  The evidence supports the trial court's conclusion that some factors favored Mother, while others favored Father. We find no evidence that the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence.  The trial court applied the correct legal standard and clearly articulated its findings in its order.  The trial court's determination falls well within the spectrum of outcomes that could reasonably result from an application of the correct legal standards to the evidence.  Accordingly, we affirm the judgment of the trial court that modification of custody would not serve the children's best interests.

### B.  Mother's Petition

Father argues that the trial court incorrectly granted Mother's counter-petition to modify the parties' parenting plan because Mother failed to meet her burden of proving a material change of circumstances.  In reviewing Father's brief, we note that the section containing his argument on this issue does not include citations to any legal authority. Nevertheless, because it is easily disposed of, we address it briefly.

Mother's counter-petition sought to change the parties' residential parenting schedule. Tennessee Code Annotated section 36-6-101(a)(2)(C) provides guidance to courts in determining what constitutes a material change of circumstances affecting the child's best interests for purposes of modifying a residential parenting schedule.  Section 36-6-101(a)(2)(C) provides:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by

a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; *failure to adhere to the parenting plan*; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C) (2010) (emphasis added). The overwhelming testimony of both parties indicates that the parties often flew the children back and forth from their visitation with Father rather than driving them as the December 2006 order instructed. Section 36-6-101(a)(2)(C) specifically states that failure to adhere to the parenting plan constitutes a material change in circumstances. Accordingly, we reject Father's contention that the trial court erred in granting Mother's petition in part because she failed to prove a material change in circumstances.

### C. Attorney's Fees and Costs

In its original order, the trial court ordered that Father pay Mother's attorney's fees and the guardian ad litem's fees.[5] On June 3, 2014, the court entered an amended order specifying that Father was ordered to pay $2,750 in guardian ad litem's fees and $25,037.44 in attorney's fees. On appeal, Father challenges only the propriety of the awards, not their amounts.

The trial court's award of both sets of fees is governed by the same abuse of discretion standard. Trial courts are given wide discretion in awarding attorney's fees and guardian ad litem fees, and this Court will not interfere with that discretion absent a clear showing of abuse. *See e.g., Keisling v. Keisling*, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005) (reviewing an award of guardian ad litem fees); *Placencia v. Placencia*, 3 S.W.3d 497, 504 (Tenn. Ct. App. 1999) (reviewing an award of attorney's fees). The Tennessee Supreme Court has explained the scope of review under this standard:

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision

---

[5]Rule 17.03 of the Tennessee Rules of Civil Procedure provides that the court may in its discretion allow a guardian ad litem's fee, which may be taxed as a costs.

made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Father contends that it would be unjust and inequitable to require him to pay the fees awarded by the trial court. We disagree. This litigation was initiated by Father. Although the court found that neither party is without some fault, Father failed to present any credible evidence to support many of the allegations in his complaint. The trial court also found that Father had significant credibility issues. Moreover, the evidence demonstrates a substantial disparity in the resources of the parties. At trial, Father testified that he earned approximately $150,000 in 2012, while Mother testified that she made approximately $40,000 per year. Given the totality of the circumstances, we are not inclined to second guess the trial court's exercise of its discretion to grant an award of costs and fees to Mother.

## V. HOLDING

Having thoroughly considered the arguments of each party and the record on appeal, we affirm the judgment of the trial court in all respects. The costs of this appeal are taxed to the Appellant, Brandon P., and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE